MISSOURI PACIFIC RAILWAY CO. v. WOTEN HALEY, as *Adm'r of the Estate of Wm. Deal, deceased.*

| 25 | 35 |
| 44 | 674 |
| 25 | 35 |
| 50 | 465 |
| 25 | 35 |
| 52 | 266 |
| 25 | 35 |
| d55 | 339 |
| 25 | 35 |
| 60 | 153 |
| 60 | 155 |
| 25 | 35 |
| 65 | 136 |

1. CH. 93, LAWS OF 1874, *Valid.* The act of February 26, 1874, entitled "An act to define the liability of railroad companies in certain cases," is not in conflict with any of the provisions of the constitution of the state.

2. RAILROAD EMPLOYÉ, *Care Toward; Contributory Negligence.* This act was adopted by the legislature of Kansas from the statute of Iowa, and the judicial construction given to the statute in that state follows it to this state; therefore, within the Iowa decisions, it embraces only those persons engaged in the hazardous business of railroading. The care or diligence the statute exacts toward the employé, is that degree of diligence which men in general exercise in respect to their own concerns, and contributory negligence of the injured employé bars a recovery under the statute, as in other cases.

3. EMPLOYÉ, *Within the Statute; Negligence of Co-employés.* A person employed upon a construction train to carry water for the men working with the train and to gather up tools and put them in the caboose or tool car, is within the statute making railroad companies liable to their employés for injuries resulting from the negligence of coëmployés.

4. CULPABLE NEGLIGENCE, *Not Shown; Railroad Company not Liable.* Where such an employé upon a construction train, consisting of an engine, two cabooses and four or five flat cars, with the engine coupled on to the caboose, with the flat cars in the rear, all slowly backing at the rate of about four miles an hour, is directed by the conductor in charge of the train to pick up a crowbar lying crosswise near the rear end of the rear flat car, and while in the act of stooping to pick up the bar, falls off and is killed by being run over by the cars, and the fall is caused by a sudden concussion or jerk of the cars from reversing the engine by the engineer to stop the train, on account of cattle near to the track at the rear of the train, and neither the statute, the rules of the company, nor the custom on the trains, requires any preliminary signal or warning to the laborers upon the train to enable them to hold fast, or otherwise secure themselves to the cars, before reversing the engine or stopping

the cars under such circumstances, *held,* that upon these facts the engineer was not guilty of culpable negligence in failing to ring the bell or sound the whistle, or giving other signal before reversing the engine; and further, *held,* that the accident, if not directly contributed to by the want of care of the employé falling from the car, may be denominated entirely a fortuitous one, for which the railroad company is not liable.

5. NEGLIGENCE, *Must be Proved.* Negligence is not to be presumed, but must be proved; and where the evidence in an action for damages against a railroad company, under the statute of February 26, 1874, shows that all the coëmployés exercised toward the injured employé that degree of care and diligence which prudent persons would ordinarily exercise under like circumstances, no liability is established against the company.

*Error from Wyandotte District Court.*

ACTION brought by *Woten Haley,* as administrator of the estate of William Deal, to recover damages sustained by two minor children of the deceased. Trial at the July Term, 1879, of the district court, when the plaintiff asked the court to instruct the jury as follows:

"1st. That the law of this state provides that 'every railroad company organized or doing business in this state shall be liable for all damages done to any employé of such company, in consequence of any negligence of its agents, or by any mismanagement of its engineers or other employés, to any person sustaining such damage.'"

(Given, and excepted to.)

"2d. If you find from the preponderance or weight of the evidence that the death of William Deal was caused in consequence of any negligence or mismanagement of the engineer of the defendant, the plaintiff is entitled, as a matter of law, to a verdict at your hands."

(Given, and excepted to.)

"3d. If the jury find that the plaintiff should recover, they have the right to assess the damages at any sum not exceeding $10,000, which in their judgment may be deemed just and proper under the evidence."

(Given, and excepted to.)

The defendant asked for the following special instructions:

"1st. The jury are instructed that, to entitle the plaintiff to recover on the ground of negligence or mismanagement of

any coëmployé of the deceased, they must find from the evidence that there was negligence or mismanagement in fact, and it devolves upon the plaintiff to show affirmatively, and by a preponderance of evidence, wherein such negligence or mismanagement existed; and they are not to assume that it did exist from the mere fact that William Deal was killed by defendant's train."

(Given.)

"2d. The court instructs the jury that if they find for the plaintiff, they should, under the evidence in this cause, assess only nominal damages."

(Refused, and excepted to.)

"3d. The court instructs the jury that, in considering the amount of damages, if they find for the plaintiff, they should not allow anything on account of the physical or mental sufferings of the deceased, or for the sorrows, suffering or grief of his personal representatives."

(Given.)

"4th. The court instructs the jury that if they believe, from the evidence, that the deceased, by his own carelessness and negligence, directly contributed, in whole or in part, to bring upon himself the injuries from which he suffered, then the plaintiff cannot recover."

(Refused, and excepted to.)

"5th. Although the jury may believe that the plaintiff's intestate was injured while an employé of the defendant so that he died from such injuries, and that they were occasioned by the negligence of a coëmployé of the defendant, or were caused by any mismanagement of an engineer of the defendant, yet the plaintiff cannot recover in this action."

(Refused, and excepted to.)

"6th. The court instructs the jury that under the pleadings and evidence in this case, the plaintiff cannot recover, and you will find for the defendant."

(Refused, and excepted to.)

The court charged the jury as follows:

"The law-makers in organizing courts have divided the same into two branches — the judge and the jury. Upon the judge devolves the duty of giving you the law applicable to the testimony in each case; and upon you devolves the duty of deciding the facts of the case. You are not only the sole

and exclusive judges of the facts of the case, but you are the sole and exclusive judges of the credibility of the testimony; that is to say, you are the only judges as to the weight that shall be attached to the testimony of each and every witness. That is a duty, as I said, that devolves solely upon you, and over which the court has no control.

"This action is brought by the plaintiff, Haley, administrator of William Deal, deceased, to recover damages for the death of William Deal, that resulted — as plaintiff claims — from the negligence of the engineer of the defendant.

"I have stated to you, gentlemen of the jury, the parties to this suit. I have done so in order to refresh your memory as to the cause, not as to the parties. The inquiries, 'Who is the plaintiff?' and 'Who is the defendant?' are inquiries that never should be made either by a court or a jury. By this I mean that the court and the jury should be absolutely blind to the parties to the litigation. You are to inquire only into the cause, not as to the contestants. You are not only, gentlemen of the jury, to be blind to the parties to the suit, but you are to be free in the decision of all cases, both you and the court; you are to be entirely free, and divested from any friendship, hatred, anger or pity in the decision of any and all questions of fact; and when a court or a jury departs from this duty and is controlled in the least by any of these passions of the mind, we not only shall, as a matter of fact, but we ought to cease to command the respect of the public, and they will rise in their majesty and institute other tribunals that will command respect. We are all liable to come into courts of justice to have our rights vindicated, and we have a right to have those rights determined by impartial tribunals; and as I said before, when we cease to have those rights ascertained and determined in that manner, without bias or prejudice, without passion of any kind, courts and juries will cease to command respect, and the administration of justice be a farce.

"I make these remarks, gentlemen of the jury, because it has been in this case, as in nearly all cases, the litigants are usually discussed more thoroughly than the litigation, and I do it in order to divert and call your attention rather to your duties as well as to mine. Perhaps it is unnecessary to make these remarks, but in view of the comments that have been made by counsel on both sides I think it my duty to do so.

"Then, gentlemen, the sole question for you to determine is, as to whether this deceased person came to his death by the neg-

ligence of the defendant, or of its servant, the engineer. That is the principal question for you to determine; and that, as I before said, depends upon the facts as established by the testimony in the trial of this cause, and is a question for you alone to determine. The law in this case will be given to you in writing, and will consist of the special instructions asked by the plaintiff, as well as the defendant; which I will now read you."

The jury found a general verdict for the plaintiff, and assessed his damages at $10,000. A new trial was denied, and judgment rendered for the plaintiff. The defendant brings the case here. Other facts appear in the opinion.

*Thos. J. Portis, E. A. Andrews,* and *E. J. Sherlock,* for plaintiff in error:

1. The court erred in admitting the testimony of James Cyphers, as to whether or not any bell was rung or whistle sounded before the deceased fell from the train, and also as to whether any other signal was given at the time. The admission of this evidence was incompetent and irrelevant, and tended to mislead the jury upon a wholly immaterial matter. The question of warning or signal could only be material when required by statute or predicated upon the proof of such a custom upon which the deceased relied for the breach of duty or obligation arising from that custom. There being no such statute, and there being no proof in this record of any such custom, the fact that no warning was given must be determined as a question of law to be no evidence of negligence; and such evidence, therefore, should not have been submitted to the jury to mislead them. The testimony in this case leads to the conclusion that this evidence was the evidence that led to the finding of the general verdict and the special finding of negligence on the part of the engineer. In some cases there may be proof of the custom of sounding a bell or a whistle before the starting of a train; but, as a matter of law, the statute of this state (Comp. Laws 1879, p. 226, § 60) requires only that "a steam whistle be attached to each locomotive engine, to be sounded three times at least eighty rods from the

place where the railroad shall cross any public road or street, except in cities and villages." This statute, then, confines the use of the whistle as a warning entirely to the crossing of public roads or streets.

2. The court erred in overruling the demurrer to the evidence offered in the case by defendant in error. It should have been sustained, because there was no evidence of negligence offered on the part of defendant in error, which would support a verdict in his favor.

3. The court erred in overruling the motion of plaintiff in error for a judgment upon the pleadings and evidence against the pefendant in error, at the close of the case made by him. We apprehend that the court will hold such a motion to be proper practice; and if so, it ought to have been sustained for the same reasons that the court should have sustained the demurrer to the evidence.

4. In giving the three special instructions asked for by the defendant in error, the court erred. The charge of the court below did not in any manner refer to the facts in this case, which it was claimed constituted negligence or mismanagement; nor did the trial judge give the jury any instructions of law bearing upon these questions, which would, in any respect, aid in correcting the improper instructions asked by plaintiff below. Objections to the first and second instructions may be considered together. The question what degree of care a man, under a given state of facts, or from the testimony and inferences to be drawn therefrom, has exercised, is a question of fact for the jury; but when they have found that degree, the court must determine from their findings whether in law such degree amounts to negligence.

The jury were at liberty under these instructions to erect their own standard of the degree of care which engineer Kelly ought to have exercised. One portion of the jury may have made him an insurer against accident to the deceased, another held him to the highest degree of care, another to an ordinary degree of care, another to the lowest degree of care; and thus, after two days of consultation, they may have come to an

agreement that they would call the cause of death the result of negligence or mismanagement; or they may have all determined. that though an accident (*casus*), it was negligence. From these instructions and finding we cannot, as a matter of law, determine what degree of care was applied to this case; and hence the error in giving such instructions.

The jury in this case should have been instructed that the word "mismanagement" in the statute required of them to find such a degree of mismanagement as would in law amount to negligence, under the circumstances of this case. (5 Otto, 702; 45 Mo. 562.) Here the jury were left to put upon the word "mismanagement" any construction they pleased; and if in their judgment the engineer was guilty of mismanagement in any particular whatever, according to the standard erected by each individual juror, without instruction on the subject, they were at liberty to find for the plaintiff, irrespective of the law as to whether such mismanagement amounted to negligence or not.

The second instruction compelled the jury, as a matter of law, to give a verdict for the injured one, even though the one injuring had exercised the highest degree of care or diligence of which man is capable. Such an instruction is vicious, and destructive of the mutual obligations of men, because, first, it ignores entirely the question of contributory negligence; and second, it requires (given as it was without qualifications adapted to the imperfections of human nature) absolute perfection in human agency. It is a proposition shorn of reason and common observation. To assume that a railroad company shall be an insurer that no employé shall in the remotest degree contribute to an injury to another employé, is void of justice to the imperfections of human foresight and conduct — a visionary proposition that a man ought to be perfect, mentally and physically.

Of course, then, the jury found a general verdict for the plaintiff; but would they have done so had the court given the fourth special instruction asked by plaintiff in error?

Under the statute of Iowa, from which this statute is evi-

dently a copy, the supreme court of that state held, in discussing the degree of care which either party was required to use, that such an instruction, in the language above quoted, was proper — appellants complaining that an instruction given at the instance of appellee (by no means so objectionable as the one given in this case), was improper. And in that case, as in this, there was a special finding that the injured one was not guilty of negligence. And it was held in the same case, that the employé causing the injury was required to exercise only ordinary care. (26 Iowa, 363.)

It was the duty of the court to have instructed the jury upon the subject of the contributory negligence of the deceased, its elements and consequences, specifying the degree of care which he was to exercise under the circumstances of this case. There was evidence in this case that the deceased was not only a careless man, but that he was reckless in going about on the train, brought out by questions on the part of defendant in error from one of his own witnesses, a person not then in the employ of plaintiff in error, against the objections of plaintiff in error.

5. The damages given by the jury are excessive. The third instruction asked by and given for the defendant in error, as to the measure of damages, was without evidence to support it. The only testimony offered upon this subject was that by Haley and Cyphers that Deal was thirty-two years old, a widower with two children, aged seven and nine years; that he had been working for the defendant about four years, the last year as a water carrier and in charge of the tools on the construction train. There is no testimony as to the amount of wages he ever earned, or as to his future prospects, or as to his general health, or fitness for future employment. (52 Ill. 290; 43 id. 338; 41 Ga. 223.)

*Byron Sherry*, and *Thomas P. Fenlon*, for defendant in error:

1. It is claimed that because there is no statute requiring the giving of a signal on the stopping of a train, that the testimony of Jas. Cyphers was incompetent and irrelevant. It

is not claimed by the defendant in error that the statute, in terms, requires the ringing of a bell or the blowing of a whistle; but we do contend that the plaintiff in error was bound to the exercise of due care and caution in running and operating its train, and that a failure to use due care and caution, whether from a failure to give notice or warning by ringing a bell or blowing a whistle, or other proper signal, is such "negligence" and "mismanagement" as would make it liable for injuries resulting therefrom; and the law, aside from statutory regulations, imposed upon plaintiff in error the duty of using due care and prudence, and to so manage its business as not to injure those in its employ. The question for the jury to determine was whether, under all the circumstances, the defendant used reasonable precaution or not. The imposition by statute of a duty to ring a bell or blow a whistle at public crossings does not comprise all the obligations resting upon railroad companies. For, independent of any statute, it is the duty of railroad companies to so manage and conduct their business as to prevent injury to others; and it is for the jury to say whether, in a given case, the company has used due care and diligence to prevent injury. In this case it was for the jury to determine, after having taken into consideration all the means of warning that might have been given, whether the defendant was guilty of negligence or not. A mere compliance with the requirements of the statute will not absolve the company from the charge of negligence. (62 Ill. 313.)

As to when a railroad company may be held liable as for negligence in running its train, upon proof of failure to give signals, or take other precautions required by the circumstances of the case, see 59 Ill. 534; 62 id. 313.; 107 Mass. 496; 113 id. 366; 116 id. 537; 34 Iowa 153; 59 Pa. St. 259; 55 Me. 438; 45 Mo. 255; 59 N. Y. 468; 10 Kas. 426.

The statute prescribes only the manner and mode of running and operating locomotives and trains at certain places;

but the law imposes upon railroad companies due care at all times and under all circumstances.

2. It is claimed that the court erred in overruling the demurrer to the evidence. In answer to this we say that there was not only evidence tending to support plaintiff's claim for damages, but that it was of a clear and positive character, and that the court could not have done otherwise than overrule the demurrer.

From the testimony of Cyphers, can there be any doubt but that the reversal of the engine produced the shock, and that it was the shock or concussion that threw the deceased from the flat car? The petition alleges that the reversal of the engine was effected without notice or warning, and that it was this act of negligence on the part of the engineer which caused the death of the deceased. Can there be any doubt on this point? The deceased was on the flat car of the train in motion, in a stooping position, in obedience to orders, in the act of picking up an iron crowbar, when, without notice or warning of any kind, the engine was reversed, giving to the whole train a jar and jerk; yet the plaintiff in error would have the court decide that there was no evidence tending to show negligence.

Having shown the manner in which deceased was killed, that the engine was suddenly reversed without signal, notice or warning of any kind, and that in consequence thereof the deceased was killed, we consider that we have thereby incontestibly established great irregularity and mismanagement in the running of the train. The burden was then on the defendant to show that it was not guilty of negligence. (12 Kas. 354; 14 Cal. 387; 42 Ill. 407; 2 Ired. 138; 54 E. C. L. 229; 14 N. Y. 218, 222; 32 id. 339; 23 Pa. St. 373.)

This court has frequently held that where there is evidence tending to show negligence, the verdict will be sustained, and that it is a question of fact for the jury to determine. (11 Kas. 47; 8 id. 224, 402; 12 id. 354; 5 id. 167.) The court could not, under the circumstances, have done otherwise than overrule the demurrer.

3. It is claimed that the court erred in overruling the motion of plaintiff in error, for judgment. We claim that there is no such practice in this state, and that it is unauthorized by statute. The same reasoning also applies as suggested on the question of overruling the demurrer.

4. It is argued that the court erred in giving the special instructions to the jury asked by the defendant in error. It is said that the court did not in any manner refer to or comment upon the facts in the case, intimating that it was the duty of the court to have done so. Courts in instructing juries frequently make extensive comments upon the evidence, but we have yet to learn that it is error in a court to omit to do so. It is, however, the duty of the court to instruct the jury upon the law of the case. This the court did in the case at bar. If the plaintiff in error had desired more extended and elaborate instructions upon the question of negligence, it ought to have prepared and submitted them. This it failed to do at the trial, and now it certainly should not complain of the court for not giving instructions not asked for.

There is nothing inconsistent in the finding of the jury that the engineer, Kelly, though competent and fit to run his engine, was, at the time complained of, guilty of negligence and mismanagement. A man may be perfectly competent to do a thing well or in a proper manner, and at the same time be guilty of negligence. For instance, an attorney may be competent to properly conduct a case in court, and at the same time for want of care may sacrifice the cause of his client. A physician may be regarded as skillful, and at the same time be guilty of malpractice. A mechanic may be skilled in his business, understand it thoroughly, but through want of proper care and caution turn out defective workmanship. A man may be a competent railroad engineer, may have borne that reputation for years, but at the same time may through want of care be the cause of some great catastrophe. What we claim in this case is, that William Deal, on the 8th day of January, 1878, came to his death by reason of a single act of negligence on the part of engineer Kelly, and it matters not

for the purpose of this case what Kelly may have been before or after. It is the one single act, to wit, the sudden reversal of his engine, without signal or warning, that caused the death, and the jury so found.

The plaintiff in error says the jury should have been instructed as to the meaning of the word "mismanagement." The jury found that the engineer "mismanaged" his engine, and it is to be supposed that the most ordinary juror understands the meaning of the word without any instruction from the court.

Counsel for plaintiff in error refer to the question of contributory negligence, and claim that it ought to have been submitted to the jury. They assume that there was evidence tending to show negligence on the part of the deceased, while we assert that there was not one word of testimony tending that way. The question of contributory negligence is always a matter of defense, and as the plaintiff in error failed, as the record shows, to bring out *any* evidence tending in the least to show contributory negligence on the part of the deceased, it naturally leaves that question entirely out of the case, and if the court had instructed the jury upon the question of contributory negligence, it would have done so upon an "assumed state of facts."

It is claimed that the deceased was a careless and reckless man; but the witness Nettleton, relied on to prove it, did not pretend to say that deceased was guilty of negligence at the time he was killed; nor is it shown by the testimony of Davis and Kern; nor is there anything in the evidence tending to show negligence on the part of the deceased.

It is insisted that the court erred in refusing to give the fourth special instruction asked for by the plaintiff in error. We contend that this instruction would not have been proper in any case.

The court is asked to instruct the jury "that if they believe, from the evidence, that the deceased directly contributed, *in whole or in part,* to bring upon himself," etc. Now, the law as settled by this court is, that if the negligence of a defend-

ant is the direct and immediate cause of an injury, and that of the plaintiff only the *remote cause*, or if the negligence of a defendant is *gross* and that of a plaintiff only *slight*, there is no such contributory negligence on the part of the plaintiff as will prevent his recovering. (5 Kas. 167, 191; 12 id. 328; 13 id. 191.)

5. It is contended that the damages given by the jury are excessive, and that there was no testimony offered as to amount of wages, future prospects, health, or fitness for future employment, and that for that reason plaintiff would not in any event be entitled to more than nominal damages. It was proven by the testimony of Haley and Cyphers that, up to and prior to his death, deceased was in good bodily health, and that at the time of his death he was a widower, and left two infant children, aged seven and nine years. This court, in *K. P. Rly. Co. v. Cutter*, 19 Kas. 83, has said that "in determining the amount of such compensation, much must be left to the good sense and sound judgment of the jury upon all the facts and circumstances of the case. No uniform and precise rule can be laid down for estimating the value to the survivors of the life of the deceased, for the elements which go to make up such value are personal to each case."

Specific proof of wages paid at the time of death is not necessary to entitle plaintiff to recover substantial damages. (24 Md. 271.) Damages are not limited to the actual pecuniary loss proved. (47 N. Y. 317; 62 Pa. St. 329.) Pecuniary damages will be presumed when the action is for the benefit of the widow or children. (75 Ill. 468; 1 Disney, 257; 21 Barb. 245; 32 id. 25; 24 Md. 271.) The mere fact that damages are excessive is not ground for a new trial. (16 Kas. 456.)

Nor will a verdict be set aside and a new trial granted when the evidence is conflicting and there appears enough to support the verdict, on the ground alone that the verdict is for too much. (5 Kas. 82; 8 id. 159, 180; 9 id. 17, 117, 399, 511, 519; 10 id. 126, 127, 512; 11 id. 47; 12 id. 161, 354, 575; 13 id. 35; 15 id. 564; 17 id. 145; 18 id. 430.) When

the facts are disputed, negligence is a question of fact for the jury. (14 Kas. 37; 10 id. 466. See also 14 Kas. 512.) When the jury find, as in this case, that the deceased was not guilty of contributory negligence, and that finding is approved by the trial court, the verdict will not be set aside or disturbed by the supreme court. (22 Kas. 686.) The verdict of a jury, based upon conflicting oral testimony, settles every disputed question of fact. (23 Kas. 287.)

The opinion of the court was delivered by

HORTON, C. J.: This was an action brought by Woten Haley, as administrator, against the Missouri Pacific railway company, to recover damages sustained by two minor children of William Deal, deceased. Deal received fatal injuries near Connor's station, between Wyandotte and Leavenworth, on January 8, 1878, caused by the alleged negligence of one Patrick Kelly, then an engineer and employé of the railway company. It appears from the evidence given on the trial, that at the time the deceased was injured he was also an employé of the company, engaged in working with the laborers on the construction train, upon which E. F. Seymour was the conductor, Patrick Kelly the engineer, Mark Nettleton the brakeman, and Nelson Thompson fireman. He had been working on that train with this conductor about two years, and had been in the employ of the company on construction trains over four years. His duties were, to carry water for the men, gather up tools and put them in the caboose or tool car until he got time to put them into the tool chest. There were about twenty-five laborers with the train. On January 8, 1878, the men on the train — consisting of an engine, two cabooses, one called in railroad parlance a "dinky," used as a tool car, and four or five flat cars — were engaged in gathering up old rails along the track from Kansas City toward Leavenworth, the engine in front, the cabooses in the rear. Connor's station was as far as they were going, and there being a pile of iron between the main track and the switch track, just beyond, but near this station, the conductor di-

rected the engineer to pull in upon the switch track, take his engine around the train on the main track and come into the switch at the east or south end, couple on to the cabooses, pull out toward the east, and back up the main track to where the pile of iron lay. The engineer, in obeying the orders given, was backing up the main track to where the pile of old iron lay, at the rate of about four miles an hour. The ends of the flat cars were west, the locomotive was east; the cabooses were between the engineer and the flats, the engine being coupled on to the caboose nearest it. There was a crowbar used by the laborers lying crosswise on what was now the rear end of the rear flat car, which conductor Seymour directed the deceased to bring forward about the time the train commenced to back. The deceased fell off the rear end of the last flat, was run over, and so severely injured that he died within an hour. Up to the time the conductor ordered the deceased to pick up the bar at the end of the rear flat car, the testimony does not disagree. As to the circumstances occurring just prior and just subsequent to the fall of deceased from the car, there is a wide conflict.

In substance, the case of the plaintiff is this:

"That the deceased, while in the performance of his duty as a laborer on the construction train, and in obedience to the orders of the conductor, and while the train was in motion and backing down, went to the rear end of the rear flat car of the train to get a crowbar, and while in the act of stooping to pick up the bar, the engineer, without notice or warning to the deceased, suddenly reversed the movement of the locomotive and train, whereby the deceased was thrown from the train and killed; that his death was caused by the neglect and carelessness of the defendant, in not giving the usual signal or customary warning."

The strongest testimony supporting the claim of the plaintiff was that of James Cyphers, who was present at the time the deceased was killed. He testified as follows:

"*Question:* State to the jury when and where you last saw William Deal? *Answer:* While alive, or dead?

"Q. Living. A. When I saw him last living, he was on

4 — 25 KAS.

the rear flat car of the Missouri Pacific construction, at Connor's station, Kansas.

"Q. State what, if anything, you know about his death; state fully the particulars? A. When I last saw William Deal, I was then myself in the caboose — that is, the tool car, a caboose called both caboose and tool car, used for the men, and also for carrying tools in to work on the road with, shovels, picks, etc., and all kinds of implements for working on the road. The last I saw of William Deal was while I was standing in this tool car. I last saw him on the rear end of the flat, three or four paces from the end of the flat. I last saw him in the act, just when he fell off, or rather, just before the concussion came. I saw William Deal in a half-stooping posture — in that position [indicating position], as if to pick up something. I saw him rise up, throw his hands that way, [indicating]; the concussion came, and he stumbled and fell off the car, with his head toward the river. The end of the flat was west; the locomotive was east. There were two cabooses, one called a 'dinky,' in railroad parlance, (what they call a caboose and tool car,) and these cabooses were between the engine and flat; and I saw him in that position. I saw him tumble over.

"Q. You refer to some concussion. What do you mean? A. I mean the sudden stopping of the car.

"Q. Which way was the car running when you saw Mr. Deal stooping down, apparently to pick up something? A. West.

"Q. Backward or forward? A. Backward, backing up.

"Q. What was the next motion of it? A. The next motion was a sudden stop, a very sudden stop, a very short stop.

"Q. How many of you were in the caboose at that time? A. I could not tell you the number of men at that time.

"Q. Was there a number of men? A. There was a number of men; yes, sir.

"Q. What was the effect? You speak of a sudden concussion: how did that concussion occur? A. The effect was they were thrown on top of each other — thrown up to the other side, some of them. I was thrown up against the door of the car.

"Q. State what that was caused by? A. It was caused by the sudden stopping of the train.

"Q. Did it stop and stand still? A. It stopped perfectly still for an instant.

"Q. And was that the cause of throwing the men about the caboose? A. Yes, sir.

"Q. At what rate of speed was the train running when it was running back, before this reversing of the engine? A. I think about as fast as a man ordinarily can trot.

"Q. How near was Deal standing to the edge of the flat car? A. Three or four paces.

"Q. State if you know what took him there? A. Well, sir, he was sent there by the conductor of the train, for the purpose of getting a crowbar they used for the purpose of unloading iron.

"Q. You say he went back to get a bar? A. He went back to get a bar.

"Q. Was there any alarm or notice given to the men of the reversing of the engine?' A. No, there was not.

"Q. Were you in a position where you could have heard any whistle or ringing of the bell? A. I was.

"Q. Was there any signal given in any other way? A. There was not."

The evidence in behalf of the company conduced to show that the deceased had obeyed the orders in regard to picking up the bar, and had brought it forward; then had returned to the rear end of the car, and was sitting down on the end with his legs hanging over; that he fell off; that the conductor discovered him under the car trucks and ordered the engineer to stop; that the engine was not reversed or stopped until after his fall.

The jury returned with their general verdict the following findings of fact:

"Question 1. Do you find that Patrick Kelly, the engineer, was negligent in the management of his engine at the time William Deal was injured? Yes.

"Q. 2. Do you find that Patrick Kelly, the engineer, mismanaged his engine at the time William Deal was injured? Yes.

"Q. 3. Do you find that Patrick Kelly was a competent and fit engineer to manage the engine at the time William Deal was injured? Yes.

"Q. 4. Do you find that the defendant knew, or by the exercise of ordinary care could have known, that Patrick Kelly, at the time William Deal was injured, was unfit and

incompetent to run the engine on that train? If he was incompetent they might have known it, but we believe him competent.

"Q. 5. Do you find that either Mr. Walshe, the assistant master mechanic, or Mr. Phelps, the foreman of the round-house, knew that Patrick Kelly, at the time William Deal was injured, was incompetent or unfit to run the engine on that train? No; they could have no personal knowledge of the fact of his competency or incompetency, not being present at the time of the injury of William Deal.

"Q. 6. Do you find that either Mr. Walshe, the assistant master mechanic, or Mr. Phelps, the foreman of the round-house, by the exercise of ordinary care, might have known that Patrick Kelly, at the time William Deal was injured, was incompetent or unfit to run the engine on that train? They might have known his competency by using due care and diligence.

"Q. 7. Do you find that Patrick Kelly reversed his engine at the time William Deal was injured before he was ordered to stop by the conductor or fireman? Yes.

"Q. 8. Do you find that William Deal was a careful and prudent man? Yes.

"Q. 9. Do you find that William Deal was a careless and reckless man? No.

"Q. 10. Do you find that at the time William Deal was injured there was a slight jar or a heavy concussion? A heavy concussion.

"Q. 11. Do you find that at the time William Deal was injured he was in the act of throwing a rock or lump of dirt at cattle upon or near the track? No.

"Q. 12. Was the death of Deal caused by any neglect of the employés of the defendant? Yes.

"Q. 13. Was Deal guilty of any negligence proximately contributing to his death? No."

The jury assessed the damages at $10,000, and judgment was entered accordingly. Several exceptions were taken to the rulings of the district court; and the principal questions arising upon the assignments of error will be considered by us — not, however, in the order presented.

As the plaintiff bases his right to recover under the provisions of the act defining the liability of railroad companies in certain cases, approved February 26, 1874, the defendant's

counsel challenge the constitutionality of the statute in a long
and able argument.

The statute reads as follows: "Every railroad company
organized or doing business in this state shall be liable for all
damages done to any employé of such company in consequence
of any negligence of its agents, or by any mismanagement of
its engineers or other employés, to any person sustaining such
damage." (Comp. Laws 1879, ch. 84, § 29.)

This statute was adopted from the laws of Iowa, enacted
in 1862 by the legislature of that state. All the objections,
except one, now urged to the alleged viciousness of its pro-
visions, have been successfully met and answered in the
opinions of the supreme court of that state. (*McAunich v.
Mississippi &c. Rld. Co.*, 20 Iowa, 338; *Ney v. The Dubuque
&c. Rld. Co.*, 20 Iowa, 347; *Hoben v. The B. & Mo. R. Rld.
Co.*, 20 Iowa, 562; *Hunt v. The C. & N. W. Rld. Co.*, 26
Iowa, 363. See also *K. C. Ft. S. & G. Rld. Co. v. McHenry*,
24 Kas. 501; *Ditberner v. Chicago M. & St. P. Rld. Co.*, 47
Wis. 138.) We concur in the views expressed by the Iowa
court as to the constitutionality of the statute, and hold it a
valid exercise of legislative power. As our state has adopted
the statute from Iowa, the judicial construction given to it in
that state follows it to this state. (*Bemis v. Becker*, 1 Kas. 226.)
Therefore the act embraces only those persons more or less
exposed to the hazards of the business of railroading. "If
there is an employer and employé, but no business of a rail-
road company to be engaged in, then the case is not within
the act." (*McAunich v. Mississippi*, supra; 2 Thompson on
Neg., p. 1000; *Union Trust Co. v. Thomason*, ante, p. 1.)

The additional or new objection to the validity of the stat-
ute now presented is, that the act is in conflict with § 1, art.
14 of the constitution of the United States. We have ex-
amined the argument and authorities upon this point, but do
not think the section referred to has any application.

Upon the trial, the defendant requested the court to in-
struct the jury "that, if they believed from the evidence that
the deceased, by his own carelessness and negligence, directly

contributed, in whole or in part, to bring upon himself the injuries from which he suffered, the plaintiff cannot recover." The instruction was refused, and herein the court erred, for the charge of the court ignored entirely the question of the contributory carelessness of the deceased, and the want of proper care and watchfulness on his part to avoid the injury. The court must have construed the act of 1874 as having wiped out contributory negligence as a defense—as being intended to hold railroad companies to extraordinary diligence and care on the part of the coëmployés; that is, to make them liable for slight neglect; or else it assumed that there was no evidence tending to show negligence on the part of the deceased. The decisions already quoted clearly establish the doctrine that the care or diligence which the statute exacts toward the employé is that degree of diligence which men in general exercise in respect to their own concerns. This is denominated, in legal language, ordinary diligence. Contributory negligence of the injured employé bars a recovery under this statute, as in other cases.

Further, it was hardly fair to assume that there was no proof of contributory negligence on the part of the deceased. Mark Nettleton, a brakeman on the train, called as a witness by the plaintiff, testified:

"There was some stock on the track near the road, at Connor's switch, near the west end of the switch; that is, hey were near the track; there were none on the track at the time we started the train, I think. We were backing up. I was on the platform of the caboose, at the brake, next to the flat car.

"Q. Go on and state what occurred. A. Mr. Deal went out there on the flats; I didn't know what purpose he went out for at the time. When he started he went by me—passed by me, but I didn't speak to him; I thought I would ask him what he was going for, but I didn't; I let him go on.; didn't say anything to him.

"Q. You saw Deal go to the rear end of the train? A. Yes, sir, to the last flat; that is, the rear flat; saw him pick up an iron bar there; I saw him—I wouldn't be positive whether he laid the bar down again or not, but he stooped

down again, picked up a clod or rock, I don't know which, to throw at this stock — the cattle along the track; they were a little way from him, on the side of the track; and about the time he threw the rock or clod at the cattle my eyes were taken off him, just at the moment; the next time I looked that way he was off the car, on the ground; I saw him down at the side of the car.

"Q. State what, if any, shock occurred to the train. A. There was a slight shock; I felt it on the caboose; I supposed I knew what occasioned the shock at that time?

"Q. What occasioned it? A. I supposed it was done by the engine being reversed, the lever thrown over. I left the brake when I felt the jar on the caboose, and stepped to the side of the caboose, to give the signal to go ahead and that there was no stock on the track. I could see the track all clear from where I was; there was nothing in the way at all."

This witness also testified on direct examination:

"Q. What was Deal's character as to prudence and as to being a careful man? A. I don't think he was as careful a man as some others would be on the train.

"Q. You will state whether you regarded him as a reckless man or not? A. He did some things on the train that I regarded sometimes as being reckless. I used to talk with him sometimes about it myself."

Floyd Davis, a young man about nineteen years old, living near Connor's station, who happened to be near at the time of the accident, testified: "Saw deceased just before he was killed, sitting down, with his legs hanging over the end of the car." On cross-examination, he said: "I saw the man fall as soon as the train was reversed."

Another witness, one Julius Kern, said, speaking of deceased:

"I thought he sat down. I could not say positively whether he did or not. He was too low almost to be standing up where I saw him.

"Q. You thought he was sitting down with his feet over the end of that car? A. Yes, sir."

The instruction ought therefore to have been given, because if there was mutual negligence — that is, reciprocal or contributory negligence of like degree — the plaintiff was not entitled to recover; and, assuming that the evidence tended to prove

culpable negligence on the part of the defendant, there was sufficient evidence to go to the jury of contributory negligence on the part of the deceased.    The omission of this instruction was the more harmful because there was no explanation to the jury of the words *"any* negligence or *any* mismanagement." The jury may have understood the instruction, "If you find from the preponderance or weight of the evidence that the death of William Deal was caused in consequence of *any* negligence or mismanagement of the engineer of the defendant, the plaintiff is entitled, as a matter of law, to a verdict at your hands," to mean that slight negligence only, or the mere failure to exercise extraordinary diligence, was sufficient to demand a verdict for plaintiff.    Such is not a true interpretation of the law.    In all cases under the statute the jury should be informed that the defendant is liable only for want of ordinary care.

In view, however, of the special findings of the jury, and as more extended and elaborate instructions upon the question of negligence were not submitted to the court by defendant, the defects pointed out might not be deemed fatal to the judgment, if the general verdict and special findings of fact had any support in the evidence.    This brings us to the consideration of the paramount question in the case, whether the company was guilty of negligence, culpable negligence, at all? Was any evidence given at the trial tending to prove that the death of the deceased was caused by the negligence or want of ordinary care of the defendant?    What constitutes negligence in a particular case is generally a question for the jury, and not for the court, is undoubtedly true; but the facts being conceded, or undisputed, the question of negligence becomes a question of law.    Especially is this true where but one deduction can be drawn from them.    Negligence is not to be found without evidence.    There is always a presumption against it; and therefore a plaintiff who asserts it, and avers that his intestate has received injuries resulting in his death in consequence of it, must always adduce proof that the defendant did not exercise ordinary care; at least, taking the

whole record, some evidence of want of ordinary care must appear in a case of this character to sustain a recovery.   In the charge of the court, the jury were instructed that the sole question to be determined was, whether the deceased came to his death by the negligence of the defendant, or its servant, the engineer?   The charge in the petition is, "that while the deceased was in the act of stooping down to pick up the crow-bar, the engineer of the train carelessly, negligently and reck-lessly, and without notice or warning to the deceased, suddenly reversed the movement of the locomotive and train, whereby the deceased was then and there, without any negligence or fault on his part, thrown from the train and under the cars, and was so crushed and injured that he on the same day died ; that the death of the deceased was so caused by the neglect and carelessness of the company in not giving the usual and cus-tomary signal or warning."   In another part of the petition, the allegation is, "that it became the duty of the defendant to give notice by signal or warning of the starting, stopping or reversing the movement of the train; and that the defend-ant wholly failed to give such notice or warning at the time the train was stopped and the engine reversed."   The special findings show, we think, that the sole negligence or misman-agement alleged was the act of the engineer in reversing the engine and stopping the train without ringing the bell or blowing the whistle, or giving other notice or warning.   If the engineer was not negligent, culpably negligent, no one of the other coëmployés was negligent, and no cause of action was proved.   The inquiry is, then, was the engineer negli-gent?   All negligence, to be culpable, necessarily implies the failure to properly perform some duty.   Now what duty did the engineer owe to the deceased, or to the other laborers on the train, which he did not properly perform?   What duty did he owe in the conduct of the engine or in the management of the train which he failed to properly fulfill?   None what-ever.   It is conceded that there is no statute requiring the ringing of a bell or the blowing of a whistle on the reversing of the engine or stopping of a train, under such circumstances

as those under which the engine was reversed and the train stopped by the engineer.

Some attempt is made by counsel of plaintiff to show that there is a custom of blowing the whistle as a signal to the men upon a train that the engineer is about to stop the train, or reverse his engine, or shut off steam, so that they may secure themselves from being thrown off by a sudden concussion or jerk of the cars. The evidence is clearly to the contrary. The only witness who was examined about the custom or duty of the engineer in this regard was George Walshe. He was the assistant master mechanic for defendant, and was called as a witness for the defense. On cross-examination he said, in answer to questions, as follows:

"Q. Is it customary when cattle are reported to be on or near the track, and it is desired to avoid any collision with them, to ring a bell or sound a danger whistle? A. As soon as he finds cattle near the track, the first thing that an engineer does, as a general thing, is to open the cylinder cock, in order to frighten them off, if he sees them at the outset.

"Q. What effect has the opening of the cylinder cock? A. To blow a hissing sound to attract their attention, till they see the cars and pass off the track.

"Q. Has that action of the engineer anything to do with the whistle, with what we call the danger signal? A. Sometimes the first thing that an engineer will do, if he finds there is great danger, in order to save killing cattle, is to reverse his engine, and then, if he wants the assistance of the brakemen, he will raise his hand and pull the cord and blow the whistle.

"Q. Does the quick, sharp whistling indicate anything from the engineer to the brakemen, or is it just to whistle the cattle off the track? A. One sound of the whistle will be to apply the brakes, two to loosen them up, and a number of sounds will be a case of danger.

"Q. When a number of sounds is given on a passenger train or any other train, it indicates danger? A. Yes, sir.

"Q. Is there any action called for by this danger signal, by the brakemen; are they to answer the signal by checking up? A. They apply the brakes.

"Q. Upon a danger signal being given? A. If he has time to give that signal; the impulse is first to reverse the engine, and then to raise his hand and blow the whistle.

"Q. Is it not the universal, undeviating practice on all well-regulated railroads that when there is danger, and it is possible for the danger whistle to be blown, to blow it? A. It will depend greatly on the speed he is going; if a man is going very slow, he can stop before he can sound his whistle, because the quickest movement would be to reverse the engine.

"Q. It is not, then, customary, if I understand you? A. After he has done that part, then he will apply the whistle.

"Q. The question was not what he would do ; I am asking you what the practice is on well-regulated railroads? A. That is the practice.

"Q. What is the immediate effect of the reversal of the engine, as you call it? A. The first thing it does, is to throw steam into the opposite ends of the cylinder and stop the piston, and that stops the cranks, and that stops the driving wheels, and that stops the engine, and that stops the tender, and then next the cars that are attached to them.

"Q. Is that all? A. So on back.

"Q. Then the result of a reversal is simply to stop the train, is it? A. Yes, sir.

"Q. It does not propel it the other way? A. No, not at the time.

"Q. What other action is necessary? A. It reverses the application of the steam in the cylinders.

"Q. Does it require any other action on the part of the engineer to start? A. After that is started, he applies the steam; he opens the throttle-valve, and it gives steam into the cylinders, and so passes back."

This evidence proves, if it proves anything, that when cattle are reported on or near the track, the customary thing to be done by the engineer, if he sees the cattle at the outset, is to open the cylinder cock to frighten them away by blowing a hissing sound; that sometimes, when the engineer finds there is great danger, in order to save killing cattle, he reverses his engine, and, if he wants the assistance of the brakemen, he raises his hand, pulls the rope and blows the whistle. If the train is going very slow, the engineer can stop before he can sound the whistle, as the quickest movement is to reverse the engine. In this case, as the train was going at the rate of only about four miles an hour, the practice would have been, as was actually adopted by the engineer, to reverse the

engine before blowing the whistle or giving other signal. The engineer, therefore, followed the usual practice; so that it cannot be said that he was under any duty or obligation by any rules or any established custom in the discharge of his services, or in the management of the engine or train, to give any signal or warning to the men on the train to make themselves secure on the cars, or to hold fast with their hands to their seats or other fastenings, as he was about to reverse the engine and stop the train.

Plaintiff's counsel make a final argument in support of the judgment, that even if it is customary to reverse an engine and stop a train, as this one was stopped, without notice or signal to the train-men, such a practice or custom ought not to be sustained as a valid custom, on grounds of public policy, and cite *Berg v. C. M. & St. P. Rly. Co.*, (7 N. W. Rep. 213, Wis. Sup. Ct., Nov. Term, 1880.) In that case "it appears from the evidence given on the trial that, at the time plaintiff was injured, he was at work for the defendant as a track-man, and had been in such employment for about two years. On the morning of December 21, 1878, he was engaged with others, under the direction of the proper foreman, in removing snow and ice from a track in the depot yard of the defendant in the city of Milwaukee. A locomotive, pushing a box car, passed him going south. He looked in the direction from whence it came, and, seeing nothing else approaching, commenced work on the same track, with his back to the south. Two other men facing south were also at work on the same track, a few feet south of him. Very soon after the plaintiff commenced work a car was thrown upon the track on which he was at work, south of him, detached from the locomotive. It was probably the same car which passed him shortly before. There was a brakeman on the top of it. The car moved slowly, and just as it approached the two men at their work, they saw it and got off the track. It passed on, struck the plaintiff, knocked him down, pushed him along the track a short distance, and then one wheel passed over his leg, injuring it so that it was necessarily amputated above the

knee.   When the plaintiff was struck he cried out, and the brakeman, who was about to descend, or was descending from the car, ran to the brake at the other end of the car, turned it down and stopped the car before the second wheel of the forward truck passed over the plaintiff."

The jury found specially, that there was a brakeman upon the car just preceding and at the time of the accident; that this brakeman did not call to the men working on the track to look out; and that the brakeman was guilty of a want of ordinary care and diligence at the time of the accident.   The court in its opinion says:

"We understand, from an examination of the testimony, and from the argument of the learned counsel of the defendant, that the custom sought to be proved is that, in switching cars in the depot yard, it is not the duty of the railway company to have a brakeman or other person upon each train of cars in motion, or upon each car which is being moved separately, to give warning to the men at work in the yard of approaching danger, but that a car may be sent along any of the tracks attached to or disconnected from a locomotive, as the exigencies of the business may require, without anyone upon it; and in such case the men employed in the yard must look out for themselves.   That is to say, it is not *per se* negligence of the company or its employés thus to move a car in its yard, unattended, and the peril of injury from a car so moving is, by the custom, one of the perils of the service, the risk of which is upon the servant.   This custom was fully proved on the trial.   But the custom has little significance in this case, for the reason that there was a brakeman on the car, who saw the plaintiff at work on the track upon which the car was moving a sufficient time before the injury to have stopped the car before it reached the plaintiff, or to have warned him of its approach.   The custom does not relieve the defendant of liability for the negligence of its other employés.   It did not relieve the brakeman of the duty of stopping the car, or of warning the plaintiff of its approach, or cast upon the plaintiff the risk of his failure to do so.   No such custom was referred to in the question proposed, and none was proved.   On the contrary, the evidence tends to show that the brakeman should have given the trackman some notice or warning of the approach of the car.   On the grounds of public policy, a custom which would permit the

brakeman to let the car run upon the trackmen when he knew their peril, and could easily avoid it, can hardly be sustained as a valid custom."

Therefore the decision of the court is based upon the negligence of the brakeman who saw the plaintiff at work on the track upon which the car was moving a sufficient time before the injury to have stopped the car before it reached the plaintiff, or to have warned him of its approach. This is sound doctrine, and meets fully our approval. The reference to the custom of not having a brakeman upon such train of cars in motion to give warning to the men at work, is a *dictum;* but assuming it to be the law, still the authority cited does not cover the case here presented. The engineer did not know that the deceased was on or near the rear end of the flat car when he reversed his engine; the cabooses intervened between him and the flats, and he was unable to see the flats at all. He was not responsible for the make-up of the train, and was backing at a slow rate of speed, in accordance with orders, and used the usual means to stop the cars. He was not bound to anticipate some accident not likely to occur, or to so conduct his management of the engine as to prevent an accident not likely to happen. No such danger was manifest, or could be reasonably anticipated, as was liable to occur in throwing cars upon a track where laborers were busily engaged at work, without any brakeman or other person to give warning to such employés; which action the supreme court of Wisconsin held in the case of *Berg v. C. M. & St. P. Rly. Co.*, supra, not sustainable as a valid custom. There are some risks and perils incident to the peculiar hazards of railroading, which every employé necessarily takes upon himself when he enters upon any service connected with the operation of a railroad, which even the extraordinary diligence of his coëmployés may not always avert. The employé is presumed to have full knowledge of these usual and ordinary dangers to his employment, and greater care and caution are required of him to prevent accidents than of persons not so employed; and the engineer had the right to presume that all the other

employés would act with proper care and caution in the discharge of their employment. Our own statute makes the company or employer liable for the injuries arising from the carelessness and negligence of those who are in the same employment—that is, the coëmployés; but the statute requires only ordinary care and diligence, and if the employé suffers from the perils of his service which ordinary diligence cannot protect him against, the company is not responsible. The accident of January 8th, 1878, upon the strongest testimony of plaintiff, if not caused by the negligence of the deceased, was entirely a fortuitous one, not resulting from the culpable negligence of the engineer or other coëmployés; and therefore we are of the opinion that there was no evidence to go to the jury of negligence on the part of the defendant. All the facts, and the only fair deduction to be drawn from them, clearly show that the engineer exercised that degree of care and diligence which an ordinarily prudent person in a like position would have exercised. The court below should have sustained the demurrer of the defendant to the plaintiff's evidence; and there was no testimony admitted thereafter to cure this error.

This case has been a long time under advisement. We have given it careful attention, and while feeling that great difficulty is thrown upon the judges who are called upon to determine questions of this sort, we find no clear pathway of duty in the matter, but by deciding, as a matter of law, that negligence was not proved. The findings of the jury, that the engineer was guilty of negligence, may have resulted from an imperfect understanding of the degree of care and diligence required of him in the management of the train and engine, owing to the meager instructions given; they may have supposed that the phrases, "*any negligence*," "*any mismanagement*," include negligence and mismanagement of *all* degrees and character; or they may have assumed, in the absence of more specific directions, that the failure to ring the bell or sound the whistle, before reversing the engine, was negligence *per se* to the deceased.

The judgment of the district court will be reversed, and the cause remanded.

VALENTINE, J., concurring.

BREWER, J.: I concur in the judgment of reversal. After a careful examination of the testimony, I am impressed with the conviction that under the circumstances of this case, negligence cannot fairly be imputed to the defendant. At the same time, I do not wish, even by implication, to be understood as assenting to the doctrine that the custom or rules of the company or the lack of any special statute are conclusive on the question of negligence. It may often be the duty of courts to pronounce conduct negligent, and grossly so, although sanctioned by the custom of the road and the rules of the company, and forbidden by no statute.