THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COM-
PANY v. SUSANNA KOEHLER, *Administratrix of the estate
of Karl Koehler, deceased.*

1. EMPLOYÉS — *Culpable Negligence.* K. was in the service of a railroad
company, engaged on the track and in the yard of the company. He
assisted in loading a car of iron rails, which were to be taken to other
portions of the company's road. The rails to be loaded were in a
pile ten feet high and ten feet from the track. The manner of load-
ing was to place rails as skids, one end on the top of the rail pile, and
the other on the middle of the track below. Two employés of the
company who were on top of the pile placed the rails on the skids,
and allowed them to slide down until ten of them were so lowered;
they would then wait until eight men who were on the ground would
lift the rails and shove them into a car which was standing on the
track near by, and also until these men had stepped aside out of
danger, when those on top would lower a like number of rails, which
would in turn be placed in the car by the eight men on the ground.
K. was one of the men engaged in placing the rails in the car; and
after lifting the last rail of a certain lot, but before he had stepped
aside, and without waiting the usual time to do so, the employés on
top lowered another rail, which struck him with great force, crushing
his leg, and from the effects of which he died. There was nothing to
prevent those on top from seeing that K. had not reached a place of
safety. *Held,* That he had a right to expect that the rail would not
be thrown down until he was safely out of the way, or at least until
he had sufficient time to get away after warning had been given; and
*further held,* that the employés on top of the rail pile were guilty of
culpable negligence in lowering the rail as they did.

2. ―――――― *Valid Statute.* The character of the employment and ser-
vice of K., at the time of the injury, places him within the provisions
of the act which makes railroad companies liable to their employés
for damages resulting from the negligent acts of other employés,
( ch. 93, Laws of 1874,) which act is held to be valid.

### *Error from Barton District Court.*

THE opinion states the facts. Trial at the June Term, 1885,
and judgment for the plaintiff administratrix for $1,500 and
costs. The defendant *Company* brings the case to this court.

*Geo. R. Peck,* and *A. A. Hurd,* for plaintiff in error.
*Diffenbacher & Banta,* and *S. J. Day,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, J.: Susanna Koehler, as the personal representative of Karl Koehler, deceased, brought this action against the railroad company to recover damages sustained by reason of his death, which occurred while he was in the service of the company, and which is alleged to have been caused by the negligence of its employés. On March 3, 1883, he was engaged with a number of others in loading rails on one of the cars of the company at Ellinwood, Kansas, and while so engaged a rail was thrown against him by the other employés of the company, which crushed his leg, and he died from the effect of the injury two days thereafter. His representative, who sues for the benefit of herself and seven minor children, obtained a verdict and judgment for $1,500, at a trial had at the June term, 1885, of the district court of Barton county.

The railroad company brings the case here, and raises three points against the judgment: First, that its demurrer to the evidence of the plaintiff below should have been sustained: second, that if negligence was shown in the case, it was that of a fellow-servant, for which the company cannot be held liable; and third, that the act of 1874, under which the liability is sought to be established, is unconstitutional and void. The first point made involves the question whether the testimony of the plaintiff below with respect to negligence was sufficient to send the case to the jury, and to support the verdict rendered. It appears that the iron rails which were being loaded, were in a pile at the side of the track, which was ten or twelve feet high, and about ten feet away from the track. To lower the rails from the pile, two skids were used, placing one end on the top of the rail pile, and the other on the middle of the railroad track. Two men on top of the pile would bring forward six or eight rails to the edge of the pile and to the end of the skids, and then lift them on the skids, one at a time, and allow them to slide down to the ground, and to the middle of the railroad track. A stock car was standing on the track a few feet from the end of the rails thus thrown

down, and eight men who were on the ground would lift these rails one at a time and put them into the car, while two men who were inside of the car placed them in position. Another man, designated by some as "boss," and by others as a foreman, sat at one side and kept a tally of the rails as they were loaded. When the rails thrown down were placed in the car, these eight men would step aside until the men on top would slide down six or eight more rails, when the men would return to load them into the car. Koehler was at work at the end nearest the car. He, with others on the ground, had just placed the last rail of a certain lot in the car, and had not yet passed aside, when the men on top threw down a rail which struck Koehler and resulted in his death. A very brief time elapsed between the loading of the last rail and the starting of the other from the top. Several of the men were in the way when it was started, but all escaped except Koehler. He had started to get out of the way, and when apprised that the rail was coming, he made a strong effort to avoid the danger, but failed.

The duty of the men on top of the pile was clear. They ought to have given the men below a reasonable time to step aside and out of danger. Not only that, but they should not have lowered a rail until the men on the ground had reached a place of safety. There was no obstruction in the way, and hence those on top could see when the men below had completed their task and had stepped aside. It was not necessary that the rails should be lowered with exact regularity as to time; nor need they lower any until the way was clear. It seems that sometimes the men on top would, before starting the first rail, shout, "Look out," and the boss, or some one below, would respond, "Ready," and then the rail would be lowered; but this was not always done. Just as the rail which did the injury was dropped, some one said, "Look out," but all agreed that the rail descended with such velocity that there was not sufficient time after it started for Koehler to get out of its way. It is insisted on behalf of the company, that if Koehler had

30—37 KAS.

looked up he might have seen that the rail was about to be thrown down, and have gotten out of the way; and also that if he had moved more quickly, and in another direction, he might have escaped. There is plenty of testimony offered on behalf of the plaintiff below, to show that Koehler had no fair warning or opportunity to avert the injury. J. H. Parkerson, a witness for plaintiff below, testified as follows:

"Q. You may state to the jury whether or not Mr. Koehler did not get out of the way, if you know. A. He could not.

"Q. You say he could not. Why could he not? A. I think that it came too fast for him. A. ———.

"Q. Had those on the rail pile been in the habit, or not, of waiting for the parties who were loading the iron below to get out of the way before throwing down other iron? A. Yes, sir.

"Q. Did they, or not, wait long enough for these parties to get out of the way, when they threw down this piece of iron which struck Mr. Koehler? Had he time to get out of the way after loading the last bar of iron before it struck him? A. I hardly think he did.

"Q. How long was it between the loading of the last rail and the coming down of the other rail? A. I do not know how long it was.

"Q. Give it as near as you can, whether or not it was almost instantaneous. A. It seemed like a very short time; I know we had not the rail out of the way and in the car."

On cross-examination he was asked:

"Q. How many men were there handling that rail that put it in? A. I do not know whether there were eight or ten.

"Q. They all got out of the way, didn't they? A. Yes, sir, they all got out of the way. They were not out of the way, though, when the rail started.

"Q. They all got out of the way except this one man that got hurt? A. Yes, sir.

"Q. This man had just as much time to get out of the way as any other? A. No, he didn't have."

On a reëxamination he testified as follows:

"Q. Then you say that from where you saw them, that it was impossible for him to get out of the way of the iron that was thrown down from the pile? A. Yes, sir, it was; when the iron started it was impossible for him to get out of the way.

"Q. You spoke of another man being by his side.  A. Yes, sir; Mr. Sauer.

"Q. How was it with him?  A. I believe that if it had not caught Koehler, it would have caught him.

"Q. If it had not caught Koehler it would have caught him?  A. Yes, sir; he was ahead of Koehler, and it seemed as though Koehler had jumped against him and probably helped him along a little.

"Q. By Koehler jumping against him pushed him out of the way and saved him?  A. Yes, sir."

Robert Hutton, the foreman in charge of the men, testified, among other things, as follows:

"Q. You may state whether or not, in your judgment, he had time to get away after loading the other rail?  A. He had if he knew the rail was coming.

"Q. But not knowing it?  A. But not knowing it, after the rail started, he didn't have time.

"Q. After the loading of the other rail into the car, how soon was the other rail thrown down?  A. Oh, it was but a few moments.

     .   .   .   "Q. Was not the rail thrown quicker than usual after the loading of the iron?  A. Yes, sir; I think it was."

Further along, the same witness was asked:

"Q. If those men then had looked toward that pile of iron before they started to go through, there was nothing to prevent them from seeing that the men on top were starting iron down, was there?  A. Nothing to prevent them seeing they were ready to; but then the men on the ground were not supposed to look up to a pile of iron twelve feet high. Those men who were on top were to look down and see if the men were ready."

At another time this witness was asked:

"Q. You say that it was the business of the men on the pile to see that everything was clear below before throwing the iron?  A. Yes, sir; it was, most assuredly.

"Q. Then at that time it was not clear?  A. The ground below was not clear just at that time, quite.

"Q. I mean the men were not out of the way?  A. Mr. Koehler and Mr. Sauer were not out of the way."

Joseph Schermoly, another witness, was working by the side of Koehler when the rail fell, and stated that the usual

time was not given for the men to get out of the way before the rail was sent down. He stated that one of the men on top let go of the rail while the other held on a moment and shouted, "Look out," but he quickly let it go. The witness stated that he was in the way, but when it started he saved himself by a quick jump. Simon Epps testified that he was working in company with Koehler at the time of the injury, and that Koehler had no time between the loading of the last rail and the lowering of the other, to get out of the way.

There is some testimony tending to show that Koehler would have had a better chance to escape if he had moved more quickly and in another direction, but it is also shown that he was proceeding in the usual way to a place of safety; and it further appears that the rail was precipitated upon him so suddenly that little time was given for reflection as to the safer course. It did not devolve on him to watch the movements of the men on the top of the pile, nor to anticipate that they would depart from the usual course of waiting until the way was clear. He had a right to expect that no rail would be thrown down until he was out of the way, or at least until he had sufficient time to get away after a warning had been given. Common prudence and the most ordinary care would dictate that such a course should be pursued. We cannot say from the testimony that the injury was the result of Koehler's fault, and the evidence against which the demurrer was directed abundantly shows negligence on the part of those who threw the rail against him. On a demurrer to the evidence, all that is required to send the case to the jury is that the testimony fairly tends to establish the essential facts of the case; and we are of opinion that more than this was shown.

1. Negligence of employés.

The next contention of the plaintiff in error is, that the employment of Kohler was not connected with the operation of the railroad so as to make the company liable for injuries inflicted upon him through the negligence of a coëmployé. Koehler was a track or section hand, who worked on the track and in the yard. The first part of the day on which he was

injured he was engaged with a crew in repairing the railroad track, and in the afternoon he assisted in loading the rails for use on other parts of the company's road. He was therefore an employé, and engaged in the business of the company when injured. The service was actually performed on the company's road, was necessary to its use and operation, and the result in the case sufficiently shows the hazardous character of the service. The case of *U. P. Rly. Co. v. Harris*, 33 Kas. 416, rules the present action. There a section-man who, with others, was engaged in unloading rails from a car to be used in the repair of the track, was injured through his coëmployés carelessly throwing a rail on his foot, and on a like objection he was held to be within the protection of the statute. The character of the employment is substantially the same in both cases, and the reasoning there applies here, and need not be repeated. (See also *Union Trust Co. v. Thomason*, 25 Kas. 5.)

The third and final point contended for by plaintiff in error is, that chapter 93 of the Laws of 1874, which makes a railroad company liable for injury sustained by one servant on account of the negligence of a coëmployé, is class legislation, which is forbidden by both the state and federal constitutions, and is void. This question has been several times considered in this court, and decided adversely to the contention of plaintiff in error. It is settled, so far as may be by this court, that the statute is valid. (*Mo. Pac. Rly. Co. v. Haley*, 25 Kas. 35; *Mo. Pac. Rly. Co. v. Mackey*, 33 id. 298. See also *Mo. Pac. Rly. Co. v. Humes*, 115 U. S. 512.)

2. Valid statute.

It is expressly stated that the other assignments of error are not insisted on, and therefore we shall not consider them; and as the points made against the judgment cannot be sustained, there must be an affirmance.

All the Justices concurring.